IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

BOBBY L. WARD, SR.,
      Plaintiff,

vs.                             Case No. 5:08cv356/RS/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## I.    PROCEDURAL HISTORY

Plaintiff's applications for DIB and SSI were denied initially and after reconsideration (Tr. 17, 26–31, 52–60). On October 4, 2007, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 17–25). On September 5, 2008, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 8–10). Thus, the ALJ's decision rendered October 4, 2007, stands as the final decision of the Commissioner and is now subject to review in this court. Ingram v. Comm'r. of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

In finding Plaintiff "not disabled," the ALJ made the following relevant findings:

1)    Plaintiff met the insured status requirements of the Act through March 31, 2006;

2)    Plaintiff has not engaged in substantial gainful activity since April 4, 2005, the date he alleges he became disabled;[1]

3)    Plaintiff has the following severe impairments: back disorder, hypertension, diabetes mellitus, schizophrenic disorder, affective disorder, borderline intellectual functioning, anxiety disorder, and somatoform disorder;

4)    Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment; and

5)    Plaintiff cannot perform his past relevant work, which was performed at "medium" to "very heavy" levels of exertion. He does, however, have the residual functional capacity ("RFC") to perform light, unskilled work.

(*see* Tr. 19–25).

## II.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by

---

[1] In both Plaintiff's DIB and SSI applications he alleged disability commencing January 1, 2003, but Plaintiff subsequently amended the alleged onset to April 4, 2005 (*see, e.g.*, Tr. 17). Thus, the time frame relevant to Plaintiff's claim for DIB is April 4, 2005 (amended alleged onset) to March 31, 2006 (date last insured).

substantial evidence or that proper legal standards were not applied."); *see also* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 (11th Cir. 1997); <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." <u>Boyd v. Heckler</u>, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* <u>Elam v. R.R. Ret. Bd.</u>, 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); <u>Falge</u>, 150 F.3d at 1322; <u>Lewis</u>, 125 F.3d at 1439; <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[2] the Commissioner analyzes a disability claim in five steps:

---

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, hereafter, citations in this Report should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

1.     If the claimant is performing substantial gainful activity, he is not disabled.

2.     If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

III.     PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.     Personal and Employment History

Plaintiff was born on October 24, 1961, and was forty-three years old on the date he alleges he became disabled (Tr. 23). He attended school through part of the tenth, eleventh, or twelfth grade (Tr. 147, 191, 390, 414).[3] Plaintiff has past relevant work as a material handler, construction worker, and sawmill laborer (Tr. 23). He has not worked since suffering an on-the-job injury, although the precise date of Plaintiff's injury is unclear (*compare* Tr. 193 (physician's note

---

[3] Plaintiff advised a psychiatrist that he quit school in the twelfth grade, he testified at a previous administrative hearing that he attended school through part of the eleventh grade, and he testified at a hearing held in connection with his instant claim for benefits that he attended school through some or all of the tenth grade.

reflecting December 9, 2002, as the date of the injury) *with* Tr. 389 (Plaintiff's testimony, establishing April 2002 as the approximate date of the injury)). The injury occurred when Plaintiff picked up a twenty-pound piece of equipment and felt a "pull" in his back (Tr. 193, 200). Since then he has experienced pain in the lower lumbar spine, buttocks, toes, and "back of [his] neck and down [his] arms"; he also has experienced numbness in the lower legs, feet, and (occasionally) hands (Tr. 200, 390–91).[4]

In November 2004, in connection with an earlier claim for benefits, Plaintiff testified that he always "hurts" and that driving, standing, sitting, and walking hurt or aggravate his back (Tr. 391–92). Plaintiff also noted that he was taking Lortab for pain, as well as other medications for diabetes and hypertension (*see* Tr. 392). Plaintiff testified that he could sit for only ten to eleven minutes and walk less than thirty minutes, and he noted that he had no physical problems prior to his on-the-job injury (*see* Tr. 393, 391). With regard to his mental condition, Plaintiff testified that he was not receiving any mental health treatment at that time (that is, November 2004) and that he had not taken any medication for emotional problems in the past two years (Tr. 393). Plaintiff noted that a psychiatrist previously stated that he saw no reason for Plaintiff to take any psychiatric medications (*id.*). Lastly, Plaintiff testified he was then living his girlfriend and his two children and that he got along with both his family and his neighbors (Tr. 394).

On June 27, 2007, at a hearing held in connection with Plaintiff's instant claims for benefits, Plaintiff testified that he could sit or stand for fifteen minutes and walk no more than fifteen feet before needing to sit down, but he also noted that he could drive for forty-five minutes before having to stop, get out of the car, stretch, and rest, after which he could stand for forty-five minutes (Tr. 415, 425–26). He testified that he has headaches about three times a week that last up to five hours and that he takes about three, twenty-minute naps each day (Tr. 417–19). Plaintiff further testified that he can lift ten pounds and ride a stationary bike for fifteen minutes (Tr. 426–27, 429). Lastly, Plaintiff testified that he takes care of his four-year-old son, who is disabled and unable to bathe or

---

[4] Plaintiff testified that he made a workers' compensation claim regarding the injury, but "they stopped it [apparently referring to payments]" after Plaintiff was secretly filmed washing a car, which activity was inconsistent with Plaintiff's representations to "the [worker's comp] Judge" regarding his physical capabilities (*see* Tr. 389).

dress himself, but he also noted that his girlfriend helps with the more strenuous aspects of his son's care (Tr. 419–22).

Plaintiff reported that his disability claim is based on several conditions, including diabetes, arthritis, and problems with his back, neck, and ankles, as well as his limited intellectual capacity (Plaintiff characterized himself as "a slow learner") (Tr. 104–05, 149–50).

B.     Relevant Medical History — Physical

1.     <u>Records of Thomas M. Park, M.D., and Records of Diagnostic Studies and Physical Therapy During the Time Plaintiff was Treated by Dr. Park</u>

As noted *supra*, Plaintiff "pulled" his back at work in either April or December 2002.[5] Plaintiff apparently underwent physical therapy in January 2003 (*see* Tr. 199), but the earliest treatment record in Plaintiff's file is dated March 20, 2003, when Plaintiff presented to the office of Dr. Park, an orthopedic surgeon (*see* Tr. 200, 169). Dr. Park obtained cervical and lumbar x-rays, which revealed "no significant abnormalities" (Tr. 202). Dr. Park's impression was "[l]umbar strain rule out herniated disk," and he recommended a lumbar MRI, prescribed a Medrol dose pack, and instructed Plaintiff to avoid lifting (Tr. 202–03).

A lumbar MRI was obtained on April 18, 2003, which revealed as follows: "A transitional vertebral body appears to be present which is labeled L5. At the L4-5 level there is a shallow broad-based midline disc protrusion superimposed on a mild diffuse disc bulge and mild diffuse degenerative endplate changes. Bulging disc material partially effaces the inferior foraminal fat bilaterally." (Tr. 210).

Plaintiff returned to Dr. Park on April 24, 2003, and reported continued back pain that occasionally went into his legs, down the side of his legs, and into his hips (Tr. 199). Dr. Park reviewed the lumbar MRI and noted a "moderately degenerative disc at L4-L5 with a disc bulge, which appear[ed] to be impinging on the thecal sac," but he did not observe any significant nerve root impingement (*id.*). Dr. Park opined that Plaintiff would "need to be off work for the next month" (*id.*). Dr. Park recommended an epidural steroid injection ("ESI"), and possibly a series of three ESIs, as well as one month of aggressive physical therapy (*id.*).

---

[5] It appears that Plaintiff was actually injured in December 2002, as most treatment records document that date as the date of the injury (*see, e.g.*, Tr. 198, 199).

A physical therapy ("PT") record dated June 24, 2003, reflects that Plaintiff underwent PT between May 21, 2003, and June 24, 2003 (Tr. 170). The therapist noted that "objective measurements" reflected improvement over the course of Plaintiff's treatment, but "subjectively" he continued to report the same amount of pain (*id.*). The therapist also noted that Plaintiff's reported pain (that is, "10/10") did not correlate with his presentation in the PT clinic, and Plaintiff was discharged from therapy (*id.*).

Plaintiff returned to Dr. Park on June 26, 2003, with continued complaints lower back pain that radiated down into his hips (Tr. 198). Plaintiff advised that he was no longer going to PT and that he had obtained only one ESI (*id.*). Dr. Park recommended that Plaintiff obtain two more ESIs and return to PT (*id.*). Plaintiff was provided with a prescription for a lumbosacral corset, diagnosed with "degenerative disc" and "disc bulge at L4-5," and advised to return for an evaluation after undergoing the two additional ESIs (*id.*).

A second lumbar MRI was obtained on January 20, 2004 (Tr. 207). The radiologist's impression was "disc protrusion and possibly minimal extrusion posteriorly at L4-5 with abutment extrathecal L5 roots bilaterally" (*id.*). The radiologist noted that Plaintiff's condition did not cause "significant spinal stenosis," although it may have accounted for "some symptomotology" (*id.*).

On April 27, 2004, Plaintiff returned to Dr. Park after being "lost to followup," and apparently, without having obtained the additional ESIs or PT previously recommended (*see* Tr. 197). Plaintiff complained of significant back pain and pain in both legs (mostly in the right leg), and he told Dr. Park that he was "unable to work" (*id.*). A physical examination revealed back pain and moderate inhibition with forward flexion and extension, and a "mildly positive" straight leg raise for "buttock type pain" (*id.*). Plaintiff's strength was "5/5" throughout, and reflexes were "2+" (*id.*). Plaintiff returned on June 9, 2004, at which time Dr. Park noted that Plaintiff was supposed to bring his most recent MRI film, but Plaintiff failed to do so (Tr. 196). Plaintiff reported that his pain level was unchanged, and he had no new symptoms (*id.*). A physical examination revealed limitation with flexion and extension maneuvers, as well as pain limited to the lumbar region. Likewise, a straight leg test produced non-radicular pain in the lumbar region only, and it was noted that Plaintiff was neurovascularly intact (*id.*). Lumbar x-rays were obtained, which revealed no changes since the previous x-rays obtained by Dr. Park (*see* Tr. 196, 202). Plaintiff was assessed

with degenerative disc disease and a herniated disc at L4-5 (Tr. 196). Dr. Park noted that he would obtain and review the January 2004 MRI film, and he discussed with Plaintiff the need for a functional capacity examination (*id.*). An office note dated June 18, 2004 (apparently made after Dr. Park obtained and reviewed the January MRI film), states that Plaintiff had a "small protrusion possibly extrusion of the L4-5 disc" that did not seem to cause any significant neural impingement (Tr. 195).

Plaintiff's last visit with Dr. Park was on June 24, 2004, at which time it was noted that Plaintiff had an "L4-L5 disc degeneration with small disc bulge but no neural impingement" (Tr. 194). Dr. Park also noted that he had reviewed a surveillance tape of Plaintiff that evidently was taped after Plaintiff sought workers' compensation benefits (*id.*). Dr. Park observed that on the videotape Plaintiff was washing a car and had essentially unlimited range of motion and activity, including unlimited forward flexion with no pain (*id.*). Plaintiff was also able to carry a bucket, wash the bottom of the car, and bend over, activity which—in Dr. Park's opinion—was in "stark contrast" to Dr. Park's observation of Plaintiff in his office (*id.*).

On October 8, 2004, Dr. Park responded in writing to questions posed by an attorney (Tr. 193). In relevant part, Dr. Park opined that Plaintiff reached maximum medical improvement on June 26, 2003, with regard to "his December 9, 2002, on the job injury"; that Plaintiff had <u>no</u> restrictions in returning to work; that Plaintiff suffered <u>no</u> permanent injury as a result of the work-related injury; and that Plaintiff's "permanent impairment rating" was zero (*id.*).

2.     <u>Records from Panhandle Family Medicine ("PFM") and Records of Diagnostic Studies Obtained During Plaintiff's Treatment at PFM</u>

Plaintiff presented to PFM on May 21, 2003, and saw Karen F. Baxley, PA-C (Tr. 285–86). He complained of chest pain, muscular pain and weakness, and symptoms of depression, including sleep disturbance, weight change, and labile mood (Tr. 286). In relevant part Plaintiff was diagnosed with "other malaise and fatigue," lower back pain, and "diabetes mellitus with hyperosmolarity, type II or unspecified type, not stated as uncontrolled" (hereafter referred to as "diabetes mellitus") (*id.*). On June 5, 2003, Plaintiff returned with complaints of dizziness, thirstiness, urinating more, sleeping difficulty, and continued back pain (Tr. 284). A cardiovascular examination was normal (Tr. 282, 284–85). Plaintiff returned on June 20, 2003, with complaints similar to those made on June 5 (Tr. 282). On September 17, 2003, Plaintiff complained of

dizziness, back pain, and (presumably) diabetic symptoms, including low blood sugar and a vision abnormality (Tr. 281). Plaintiff also reported that he was having difficulty paying bills since his son was removed from his home, which resulted in either the reduction of elimination of certain Medicaid income (*see id.*). PA Baxley noted that PFM would "take care of him today" despite Plaintiff's limited funds (*id.*). She also noted that Plaintiff was applying for disability based on his back condition, and she would "see if [PFM could] help him in every which way" (*id.*). Plaintiff returned on October 29, 2003, and December 10, 2003, for follow-up and medication refills (*see* Tr. 279–80). His diagnoses were listed as lumbago (lower back pain), diabetes mellitus, "other insomnia," and "other and unspecified hyperlipidemia." Plaintiff was instructed to return in four to six-week intervals or on an "as needed" basis (*see id.*).[6]

Plaintiff returned to PFM in 2004, 2005, 2006, and through April 2007 on, approximately, a monthly basis (*see* Tr. 236–80; 321–64 ).[7] In February 2004 Plaintiff advised PA Baxley that an ESI (presumably obtained during his treatment by Dr. Park) provided "a little bit of relief but not much," and—despite continued lower back pain—that he elected to forgo surgery because "he [was] afraid he may not walk again" if he had surgery (Tr. 279). In early March 2004 it was noted that Plaintiff was "doing quite well" and not "really" complaining about his back (Tr. 276). In late March, however, Plaintiff reported "very severe" back pain and stated that Lortab was not relieving the pain (Tr. 274). PA Baxley indicated that Plaintiff's Lortab prescription would be increased (*id.*). In April 2004 Plaintiff reported doing "fairly well," although some "lower back spasm" was noted (Tr. 275). His blood pressure was "excellent" (*id.*). Likewise, in July 2004 Plaintiff reported having "a fairly good month," although he continued to report lower back pain (Tr. 273). In August 2004 Plaintiff was noted to be "doing fairly well on his Lortab," although it again appeared necessary to increase his prescription "to a few more tablets per month" (Tr. 269). In September 2004 Plaintiff

---

[6] It should be noted that some of the PFM records appear to be out of chronological order. For example, transcript pages 280, 279, and 278 correspond, respectively, to pages "9 of 42," 11 of 42," and "10 of 42" of the treatment records. Similar pagination errors occur throughout the PFM treatment records, yet reordering the pages does not eliminate the confusion. Thus, the descriptions of Plaintiff's treatment at PFM might, inadvertently, contain incorrect treatment dates, but the details of his treatment are accurate.

[7] Because it is not necessary to specifically describe each of the remaining treatment records, only a general description is provided.

stated that he was "doing fairly well with his back pain as long as he's taking his Lortab," and PA Baxley noted that Plaintiff was "adequately controlled on his present medications" (Tr. 268). In October 2004 Plaintiff reported "severe" back pain and stated he was taking approximately one Lortab every four hours, which did not "really kill the pain, it just deaden[ed] the pain" (Tr. 267). At this visit Plaintiff also reported to PA Baxley that "Workman's comp. [was] giving him trouble as far as evaluation for his injury." (*id.*). In November 2004 Plaintiff reported "chronic" back pain, and in December 2004 it was noted that Plaintiff continued to "have appreciable problems with his back pain," although Jason D. Hatcher, D.O., also noted that the "Mobic and Lortab seem to be helpful" (Tr. 264). Dr. Hatcher conducted both musculoskeletal and psychiatric examinations.[8] The musculoskeletal examination revealed stiffness and soreness to palpation in the lower and mid-lumbar spine (Tr. 265). Dr. Hatcher continued Plaintiff on the same medication regimen but added Lidoderm patches to be applied topically over the most painful areas of Plaintiff's back (Tr. 264).

Plaintiff returned to PFM on January 7, 2005, and again saw Dr. Hatcher (Tr. 261). He reported "feeling pretty shaky" and experiencing blurred vision (*id.*). He also reported that his blood sugar had been "anywhere from almost 300 to sometimes below 100" (*id.*). Dr. Hatcher adjusted the diabetic medications and encouraged Plaintiff to follow a diabetic diet, avoid concentrated sweets, eat three meals a day, and snack if he "felt shaky" (*id.*). Dr. Hatcher also ordered blood work and other diagnostic testing, and he arranged for a referral to an optometrist because Plaintiff's vision was reportedly "20/50," even when Plaintiff was tested with corrective lenses (*id.*).[9]

A cervical spine MRI was obtained on January 17, 2005 (Tr. 204). The radiologist noted that "moderate motion artifact is present throughout the study" and, therefore, "the discs are difficult to evaluate" and the study is "limited" (*id.*). Notwithstanding, he opined that "there appears to be a broad based disc protrusion in the midline and to the left of midline at C5-6," as well as "mild foraminal stenosis" on the left at C6-7, secondary to degenerative changes and bulging disc material (Tr. 204–05). Otherwise, the study appeared unremarkable (Tr. 204). Also on January 17, 2005, a third lumbar MRI was obtained (Tr. 206). The radiologist's impression was as follows: "There

---

[8] The results of Dr. Hatcher's psychiatric examinations are discussed, *infra*.

[9] Plaintiff was seen by an optometrist in June 2005, and his vision was noted to be 20/20 in both eyes with no evidence of diabetic retinopathy (Tr. 234).

is some interval progression of the protrusion/developing disc extrusion (disc herniation) in the midline and to the right of midline at L4-5 as compared to [the MRI] study dated 01-20-04," causing "mild spinal canal stenosis." (*id.*). Mild proximal foraminal stenosis was also observed bilaterally (*id.*).

In or about February 2005 Dr. Hatcher reviewed the January 2005 lumbar MRI and determined that he should refer Plaintiff to an orthopedic physician for an opinion regarding the proper course of treatment (*see* Tr. 259–60). In early March 2005 Dr. Hatcher advised Plaintiff that the orthopedic physician (Dr. Park) would not see or treat Plaintiff because he was aware of the surveillance video that depicted Plaintiff "washing his car and lifting buckets of water and bending to wash the bottom of the car," which demonstrated that Plaintiff had full range of motion and suggested that Plaintiff was malingering (*see* Tr. 254). Thus, Dr. Hatcher believed referral to a different orthopedic physician was appropriate, as he was not aware of the "clinical significance" of the abnormal MRI results (*id.*). Plaintiff was diagnosed with "displacement of lumbar intervertebral disc without myelopathy," "cervical spondylosis without myelopathy," and diabetes mellitus (Tr. 255). In late March 2005 Plaintiff presented to Dr. Hatcher reporting "lots of back pain" and requesting that Dr. Hatcher fill out disability paperwork (Tr. 252). A musculoskeletal examination revealed paraspinal muscle spasms bilaterally, decreased grip strength ("3/5" on the left and "4/5" on the right), and a "guarded gait" (Tr. 252; *see also* Tr. 227). On April 14, 2005, Plaintiff returned to PFM and was seen by Steven J. Walter, PA-C (Tr. 251). Plaintiff reported nerve pain in his arms and lower extremities (*id.*). PA Walter noted that other than Plaintiff's need for a podiatry referral and medication refills, he had no other problems (*id.*). Plaintiff's blood pressure was described as "excellent," and on physical examination Plaintiff was awake, alert, cooperative and pleasant (*id.*). Plaintiff returned on April 21, 2005, and saw Dr. Hatcher, who noted that Plaintiff continued to have "appreciable back pain" and would be continued on his current medications which had been "helpful," although they did not completely alleviate Plaintiff's pain (Tr. 250). In mid-May 2005 Plaintiff told Dr. Hatcher that he had "pretty severe back pain and muscle spasm," and a physical examination revealed "appreciable tenderness" to palpation in the thoracic and lumbar spine (Tr. 244). On June 13, 2005, Dr. Hatcher noted that Plaintiff appeared to have a flat affect and anxious mood, and Dr. Hatcher provided Plaintiff with antidepressant medication (*see* Tr. 245–46). Also in June 2005 it was noted that Plaintiff continued to have "a lot

of neck and low back pain," although Plaintiff reported that his pain medication was "helpful" (Tr. 245). A musculoskeletal examination revealed tenderness to palpation in the posterior neck muscles and the lumbar paravertebral muscles bilaterally (Tr. 243). On a second visit to Dr. Hatcher in July 2005, Plaintiff reported "lots of pain in his neck and back," and Dr. Hatcher discussed with Plaintiff the possibility of "increasing his pain meds to Percocet," but Plaintiff "decided against" an increase to Percocet (Tr. 241). In September 2005 Plaintiff reported severe back pain to PA Baxley and noted that he was taking two to three Lortabs per day, although PA Baxley's review of Plaintiff's records revealed that he was being prescribed 120 Lortabs per month (or four Lortabs per day), so Plaintiff was actually taking more than four Lortabs per day because he had run out earlier than he should have (*see* Tr. 239). PA Baxley indicated that she would ask Dr. Hatcher whether Plaintiff's prescription could be increased to 150 Lortabs per month (*id.*). Plaintiff returned on October 12, 2005, and complained that his legs were bothering him, his "nerve medication" was not working, and he was "just not feeling well" (Tr. 236). He also reported being "stressed out" due to financial difficulties (*see* Tr. 236–37). Results of a random glucose check were "excellent," and Plaintiff's blood pressure was noted to be stable. Plaintiff had some tenderness in the right lower leg, and he reported that the leg occasionally swelled, but it was not swollen on the day of his visit, and PA Baxley told Plaintiff to return when the leg was swollen so she could examine it (Tr. 236–37). In or about November 2005, Plaintiff returned to PFM with complaints of anxiety and back and neck pain, stating that the back pain was worse than the neck pain (Tr. 364). It was noted that Plaintiff had been in ten days earlier demanding to obtain Lortab earlier than prescribed, but Plaintiff was advised that he would not be prescribed more than 150 tablets per month, he needed to make that amount last through the end of each month, if he was not happy with the prescribed amount he "could take his business elsewhere," and Dr. Hatcher would probably "fire" Plaintiff as a patient if he exhibited the same behavior again (*id.*). In December 2005 Plaintiff reported that his back "not bothering him as much as [it] normal[ly]" bothered him (Tr. 363). His vitals were reviewed and deemed "unremarkable" (*id.*).

On February 1, 2006, Plaintiff saw PA Baxley and reported back pain, "particularly in the sacrum area," and upon examination some tenderness was detected there (Tr. 359). Plaintiff told PA Baxley that he had again run out of pain medicine (*id.*). One month later Plaintiff met with PA Walter and complained of "severe" back pain (Tr. 358). When PA Walter inquired about the

possibility of seeing a pain management specialist, Plaintiff responded that he "sure [would] like to be out of this pain," but he "doesn't want to be paralyzed as might occur with any type of surgery or pain shots" (*id.*). In April 2006 Plaintiff met with Dr. Hatcher and reported back pain as well as worsening joint pain in his knees, elbows, hands, and feet (Tr. 355). Plaintiff also reported that he had applied for disability based on intellectual deficits, noting that he had previously applied for disability but was denied because it was determined that he could work with restrictions (*id.*). Dr. Hatcher commented, "We're going to see where the disability leads him this time. He's under a lot of financial stress right now." (*id.*). Plaintiff again saw Dr. Hatcher in May 2006 and reported doing "fair" but continuing to have "quite a bit of back pain" (Tr. 353). No muscle spasm was present, but some muscular tenderness was noted (*id.*). Plaintiff told Dr. Hatcher that he had an opportunity to work at a sawmill, but he was not sure whether he could perform the work; Dr. Hatcher encouraged Plaintiff to "at least give it a try," noting that he did believe it would be dangerous for Plaintiff to work at the sawmill (*id.*). In June 2006 Plaintiff reported continued back pain, stating that his back hurts "whenever his heart beats" (Tr. 351). In light of Plaintiff's report, Dr. Hatcher thought Plaintiff should undergo an abdominal ultrasound to ensure that an aneurysm was not causing his pain, although Dr. Hatcher suspected it was "just a sensation" Plaintiff was feeling (*id.*). Dr. Hatcher prescribed Duragesic for pain, noting that he hoped Plaintiff would require less Lortab (*id.*). On June 12, 2006, Dr. Hatcher noted that the Duragesic had "helped" but did not completely control Plaintiff's pain (Tr. 349). At a subsequent appointment in June it was again noted that the Duragesic had helped and, with Lortab, Plaintiff's pain was "dulled" but not completely eliminated (Tr. 348). On July 13, 2006, Plaintiff advised Dr. Hatcher that he could no longer tolerate the Duragesic patches because they were causing nausea and vomiting (Tr. 346). Dr. Hatcher therefore prescribed methadone, in combination with Lortab for breakthrough pain (*id.*). Later in July Plaintiff reported "very limiting" back pain, although he stated that a back brace had been helpful (Tr. 343, 342). Plaintiff also reported "having a lot of financial troubles" and being "hounded by bill collectors" (Tr. 342). In August 2006 Plaintiff returned and reported worsening back pain, which prompted Dr. Hatcher to refer Plaintiff for another lumbar MRI (Tr. 339).

 On August 22, 2006, a fourth lumbar MRI was obtained, the results of which were largely the same as the MRI obtained in January 2005 (*compare* Tr. 336–37 *with* Tr. 206–07). Indeed, the

radiologist noted that, "No overall significant interval change is appreciated as compared to the previous study." (Tr. 337).

Upon review of the August 2006 MRI results, Dr. Hatcher again recommended referral to an orthopedic surgeon, but Plaintiff declined, noting that he did not want surgery as long as his symptoms were reasonably controlled (Tr. 335). Plaintiff stated, however, that if things got worse and he got to the point where he "just [could not] bear the pain or the medication [lost] its effectiveness" he would consider surgery (*id.*). In or about September 2006 Plaintiff reported to Dr. Hatcher that Lortab and methadone were helping his back pain, although he stated that eighty-two methadone tablets had somehow disappeared from his house, and he theorized that someone might have broken into his house and taken them (Tr. 333). In September and October 2006 Plaintiff reiterated his desire to control his pain with pain medication rather than surgery (Tr. 333, 332). In November 2006 Plaintiff reported doing "very well" on the methadone and Lortab, and he stated that he was "doing better than he ever ha[d] in the past" (Tr. 331). Dr. Hatcher commented that the medication regimen seemed to be "perfect" for Plaintiff's back pain and would be continued (*id.*). In December 2006 Plaintiff noted that the Lortab and methadone were "helping him on a general basis" but nevertheless stated that he was "not doing well as far as his low back pain" (Tr. 329). PA Baxley observed that Plaintiff seemed "very frustrated because he is not getting any disability and he states he really needs it for himself and his family" (*id.*).

Plaintiff returned to PFM in January 2007, reporting that "his back has been really bothering him" and that he was "not sure if he [was] going to hold out or if the pain medicine is going to keep him content as far as his back pain" (Tr. 327). In February 2007 Plaintiff met with PA Baxely and reported that he had "quite a bit" of back pain, but his medications were alleviating most of the pain (Tr. 326). In March 2007 Plaintiff reported doing "fair" on his medications (Tr. 324).

Based on Plaintiff's complaints of back pain and an occasional inability to "feel" his leg, a repeat lumbar MRI was obtained on April 27, 2007 (Tr. 323, 321), although this MRI was obtained at a different facility than the previous MRIs and was reviewed by a different radiologist (*see* Tr. 319–20). The radiologist's impressions were: 1) slight disc degeneration at L4-5 associated with

anular bulging and neural foraminal encroachment; 2) no definite disc herniation or spinal stenosis noted; and 3) a slight degree of facet joint inflammation apparently present at L4-5 (Tr. 319–20).[10]

### 3. Opinions of Non-Examining Agency Consultants

A Physical RFC Assessment form was completed by on May 19, 2005 (Tr. 226–33). The physician opined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand, walk or sit about six hours in an eight-hour workday (Tr. 227). Further, Plaintiff had the unlimited ability, subject to the above restrictions, to push or pull, but was occasionally limited in his ability to climb ramps or stairs, balance, stoop, kneel, crouch or crawl, and he should avoid climbing ladders, ropes, or scaffolds (Tr. 228). Plaintiff had no visual or communicative limitations and no limitations in his ability to feel or reach in all directions (Tr. 229–30). Plaintiff's ability to perform fine and gross manipulation was limited to "occasional," due to a reduced grip strength on the left (Tr. 229). Lastly, the physician opined that Plaintiff had no environmental limitations except with regard to exposure to hazards, such as machinery or heights, which should be avoided (Tr. 230).

A second Physical RFC Assessment form was completed on November 8, 2005 (Tr. 287–94). The second agency physician reached the same opinions as the first, with the following exceptions: 1) Plaintiff was only "occasionally" limited with regard to climbing ladders, ropes or scaffolds; 2) Plaintiff had no manipulative limitations; and 3) Plaintiff had no environmental limitations (Tr. 288–91).

### C. Relevant Medical History — Mental

### 1. School Records

When Plaintiff was approximately sixteen years old he was evaluated by a clinical psychologist, apparently at the request of the school board (*see* Tr. 98–100). Two intelligence tests were administered, which resulted in I.Q. scores of 62 and 60 (Tr. 98). The psychologist noted that Plaintiff exhibited no evidence of a serious emotional disturbance (Tr. 99). Additionally, the psychologist rated Plaintiff's "Adaptive Behavior" abilities and found that he had either borderline or mild adaptive deficits but no moderate, severe, or profound deficits (*see* Tr. 99–100). Following

---

[10] On June 13, 2007, Dr. Hatcher completed a form, on which he offered opinions regarding Plaintiff's physical abilities, which will be discussed more fully *infra*.

this evaluation it appears that Plaintiff was deemed an "educable mentally handicapped" student, and he was placed in special education classes at his high school (*see* Tr. 101–02).

2.     Records from the Life Management Center, Dr. Gray, and Dr. Hatcher

In or about July 1999, Plaintiff was convicted of a domestic violence offense and referred to the Life Management Center of Northwest Florida ("LMC") to be evaluated and to complete a domestic violence program (Tr. 186–88).  Plaintiff was assessed with "Adjustment Disorder with Mixed Disturbance of Emotions and Conduct" and a Global Assessment of Functioning ("GAF") score of sixty[11] (Tr. 188).

Plaintiff was again referred to the LMC in February 2004, apparently following his reports of auditory and visual hallucinations to the Department of Children and Families ("DCF") (*see* Tr. 171, 173).  Plaintiff was assessed with "Psychotic [Disorder] (by previous report)," borderline intellectual functioning ("BIF"), depressive disorder, not otherwise specified ("NOS"), and a GAF score of fifty-one (Tr. 177).  After attending group sessions, Plaintiff was assessed with a GAF score of fifty-five and discharged from all LMC services (Tr. 179).

On March 17, 2004, Plaintiff was evaluated by Ken Gray, M.D., a psychiatrist, apparently in connection with efforts to get his son out of DCF custody (Tr. 191–92).  Dr. Gray noted that Plaintiff's chart contained an indication that Plaintiff was schizophrenic, but Plaintiff denied that he suffered from any type of mental disease, including schizophrenia, and he denied experiencing auditory hallucinations (Tr. 190).  Dr. Gray observed that Plaintiff was alert "times four"; his memory was grossly intact, although Plaintiff did not know all of his past history; his speech was clear, coherent, and goal directed without being tangential or circumstantial; he denied any suicidal or homicidal ideation, intent, plan, or previous attempt; he was not paranoid, delusional, or hallucinating; he had no loose association, "flights of ideas or ideas of reference"; his cognitive functioning was grossly intact; he handled "everyday minor mathematical problems . . . "quite well" but was unable to perform some "higher functions"; he had good attention span and 100% eye

---

[11] GAF is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994).  It may be expressed as a numerical score. *Id.* at 32.  A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning  (e.g., few friends, conflicts with peers or co-workers).  *Id.*

contact throughout the interview; he was not depressed; his psychomotor activity was in the normal range; and his insight was "limited" and his judgment "fair" (Tr. 191). Plaintiff was assessed with depressive disorder, NOS, personality disorder, NOS, BIF, and a GAF score of fifty-six (*id.*). Plaintiff was offered medication but "refused" such medication (Tr. 192). Plaintiff returned on June 10, 2004, and was seen by a nurse (Tr. 189). He denied being depressed or having hallucinations, delusions, paranoia, or suicidal ideation and stated he was "doing great" and did not want treatment (Tr. 188–89). The nurse characterized Plaintiff's mental status as "normal" (Tr. 189). Her diagnoses were the same as Dr. Gray's, although she assessed Plaintiff with a GAF score of 50 (*id.*).[12]

In December 2004, Dr. Hatcher conducted the first of (approximately) fifteen psychiatric examinations. With only two exceptions, following each examination Dr. Hatcher noted as follows:

> Speech pattern is spontaneous with good articulation and rate. Thought processes including rate, content, reasoning, and computation are felt to be normal. Thought association seems logical and intact. [Plaintiff] has no evidence of hallucination, delusion, suicidal thoughts, or obsessions. [Plaintiff's] judgement and insight about everyday activities and situations seems normal. Mental status exam reveals orientation to time, place, and person. Recent and remote memory are intact. Attention span an [sic] concentration are in normal limits. [Plaintiff's] ability to name objects and repeat phrases reveals language skills to be intact. Awareness of current events and past history reveals an adequate fund of knowledge. Estimate of mood and affect show no evidence of depression, excessive anxiety, or agitation.

(Tr. 265).[13]

### 3. Opinions of Consultative Examiners/Psychologists

---

[12] A GAF score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).

[13] The remaining examinations were conducted in 2005 in January (two occasions), February, March, May, July, and September (Tr. 262, 259, 257, 255, 249, 243, 240). In 2006 the examinations were conducted in May, June (two occasions), July (two occasions), August, and September (Tr. 353, 351, 349, 347, 345, 338, 334). In January and May 2005, Dr. Hatcher did not include the last line (i.e., "Estimate of mood and affect show no evidence of depression, excessive anxiety, or agitation.") in his findings (because he found in January 2005 that Plaintiff's mood was "anxious" (Tr. 262) and in May 2005 that Plaintiff's affect was "flat" (Tr. 249)), but otherwise the January and May findings were the same.

On April 4, 2005, Plaintiff was evaluated by George L. Horvat, Ph.D. (Tr. 211). Dr. Horvat commented at the outset that Plaintiff understood that the information obtained during the evaluation would be used in conjunction with his disability claim (*see id.*). Next, Dr. Horvat noted that Plaintiff reported "no mental problems" (*id.*). Dr. Horvat stated, however, that Plaintiff appeared to be in a "stupor," and his attention was "confused," concentration "scattered," and memory defective, although he was oriented as to person and place (Tr. 212). Dr. Horvat further noted that Plaintiff's "mood and [] affect were depressed," and his "speech flow was just a flight of ideas, and [his] thought content focused on persecutions" (*id.*). Dr. Horvat commented that Plaintiff "showed signs of somatic preoccupations and auditory and visual hallucinations, and his organization was loose." (*id.*). Additionally, Dr. Horvat stated that Plaintiff's "abstraction was concrete, his judgment dangerous, his reality distorted, his insight nil, and his decision making abilities impulsive." (*id.*). Continuing, Dr. Horvat stated that Plaintiff:

> denied all symptoms, past and present, of obsessive thoughts and compulsive behaviors and he evidenced no indication of such disorders. When asked about delusional thoughts, he said, 'I hear voices and see the devil. My ways are waving. A voice tells me to rob, shoot, steal, curse, etc. But I decided not to do what they are telling me to do. It is scary to hear that someone is talking to you and you can't see anyone. People are out to kill me. One man tried to kill me because I don't have the $1300 to repay the $500 I borrowed from him. Everybody is sneaking around behind my back and talking about me.'

(*id.*). Plaintiff reported that his biggest stressors were money, housing, work, and illness (*id.*). Plaintiff was diagnosed with dementia, NOS, paranoid schizophrenia, and mild mental retardation (Tr. 213). With regard to Plaintiff's prognosis, Dr. Horvat stated, "It is obvious that [Plaintiff] has IQ and memory deficiencies, but difficult to confirm without some testing or records of pasts tests. He appears to need a supervised situation and might be able to work in a sheltered workshop, if they are able to handle both physical [sic] and mentally handicapped" (*id.*). Lastly, Dr. Horvat opined that if Plaintiff received disability income, he did not believe Plaintiff was capable of managing his funds (*id.*).

On June 25, 2007, Plaintiff was evaluated by Brent Decker, Ph.D. (Tr. 369). Dr. Decker conducted I.Q. testing which resulted in a full scale I.Q. score of seventy-four, a performance I.Q. score of seventy-five, and a verbal I.Q. score of seventy-seven, which scores placed Plaintiff within the borderline range of intellectual functioning (Tr. 371). Dr. Decker also administered the

Minnesota Multiphasic Personality Inventory, Two ("MMPI-2"), the results of which indicated problems with anxiety, depression, anger management, mental confusion, and suicidal ideation (Tr. 375). Dr. Decker stated, however, the MMPI-2 test results "should be "interpreted with caution because the profile suggests that [Plaintiff] has difficulty understanding the test items due to lack of cooperation and confusion" (*id.*). Plaintiff's score on the Beck Depression Inventory, Two, suggested "severe clinical depression" (Tr. 376). Dr. Decker also noted Plaintiff's reports of hearing voices and his belief that he was possessed by evil spirits and that his soul leaves his body (Tr. 375). Following the evaluation, Dr. Decker's diagnostic impressions were schizoaffective disorder (depressed type), pain disorder with both psychological and physiological features, reading disorder, mathematics disorder, and BIF (Tr. 376). In the "RECOMMENDATIONS" section of his report Dr. Decker opined that Plaintiff was "rather limited" due to his BIF and physical functioning; that Plaintiff appeared to have "significant emotional problems," did not relate well, and could not communicate very well; and that Plaintiff's "head injury resulting from falling off of a truck early in his life may have resulted in a head related injury which was never addressed" (Tr. 376–77). Lastly, Dr. Decker noted that "the combination of these difficulties can make it difficult for [Plaintiff] to function independently or maintain any consistent type of gainful employment" (Tr. 377).

### 4. Opinions of Non-Examining Agency Experts/Psychologists

Eric Martin, Ph.D., completed a Mental RFC Assessment on May 18, 2005 (Tr. 214–17). Dr. Martin evaluated Plaintiff's mental abilities in the following general areas: understanding and memory, sustained concentration and persistence, social interaction, and adaptation (Tr. 214–15). In each category, Dr. Martin was given the following choices regarding twenty specific mental abilities: not significantly limited, moderately limited, markedly limited, no evidence of limitation in the category, or not ratable on available evidence (*id.*). Dr. Martin found that Plaintiff was moderately limited in three areas (ability to understand and remember detailed instructions, ability to carry out detailed instructions, and ability to maintain attention and concentration for extended periods), but in the seventeen remaining areas Dr. Martin found that Plaintiff was not significantly limited (*id.*). Dr. Martin also completed a Psychiatric Review Technique Form ("PRTF") (Tr. 218–25). He opined that Plaintiff had three medically determinable impairments (probable BIF, depression, NOS, and personality disorder by history, NOS), but none satisfied the diagnostic

criteria of the Listings (Tr. 219–21, 223). Dr. Martin further opined on the PRTF that Plaintiff had only mild or moderate functional limitations as a result of his mental impairments (Tr. 222). Dr. Martin acknowledged Plaintiff's report to Dr. Horvat of hallucinations, but he opined that Plaintiff's report (and, apparently, Plaintiff's demeanor before Dr. Horvat) appeared to be "an attempt to malinger psychopathology [and] cognitive limitation" in light of the "videotape[d] evidence of malingering" and the fact that the "[l]ongitundinal evidence contraindicates diagnoses of mental retardation or schizophrenia" (*see* Tr. 224).

Judith A. LaMarche, Ph.D., completed a Mental RFC Assessment on November 16, 2005, and was given the same choices as Dr. Martin (Tr. 309–12). She opined the Plaintiff was <u>moderately</u> limited with regard to four areas of mental functioning, <u>not significantly limited</u> with regard to thirteen areas, and had <u>no evidence of any limitation</u> with regard to the remaining three areas (*see* Tr. 309–10). She also completed a PRTF, and like Dr. Martin she concluded that none of Plaintiff's mental impairments (that is, probable BIF, "diagnosis of paranoid schizophrenia at [Dr. Horvat's consultative examination]," depression, NOS, anxiety, and personality disorder by history) met the criteria of a listed impairment (*see* Tr. 296–98, 300, 302, 306). She also found that Plaintiff had only mild or moderate functional limitations (Tr. 305). In reaching her conclusions Dr. LaMarche noted, in relevant part, indications in the record of malingering, Plaintiff's refusal of medication offered by Dr. Gray, Dr. Hatcher's repeated psychological evaluations that were "generally indicative of [a] psychiatric status that is intact and [within normal limits]," and the lack of a diagnosis of any significant cognitive or psychiatric disorder by a treating physician, referral for mental heath treatment, or psychiatric inpatient hospitalization (Tr. 307).

IV.    DISCUSSION

Plaintiff raises four  issues in the instant appeal (*see* Doc. 20 at 1, 15), which for organizational purposes are rearranged in this Report. Plaintiff asserts that the ALJ erred in rejecting the opinions of Dr. Hatcher, a treating physician. Next, Plaintiff alleges that the ALJ's mental RFC determination is improper because it does not include limitations relating to all of his severe mental impairments. Plaintiff also alleges the ALJ erred in rejecting the opinions of Dr. Horvat and Dr. Decker, consultative examiners, and in finding Plaintiff less than fully credible.

A.    The Opinions of Dr. Hatcher

On June 13, 2007, Dr. Hatcher completed a form titled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" (hereafter "MSS form"), on which he offered the following opinions. Plaintiff can "occasionally" and "frequently" lift ten pounds, stand and/or walk "at least" two hours, and sit "less than about 6 hours" in an eight-hour workday (Tr. 365–66). He can occasionally kneel or stoop but cannot climb, balance, crouch, or crawl (Tr. 366). He has no limitations in his ability to reach, handle, finger, feel, see, hear, or speak, and has no environmental limitations, except with regard to exposure to temperature extremes, which should be limited due to the effects of "extreme cold" on his joints (Tr. 367–68). Lastly, Dr. Hatcher opined, if Plaintiff worked he would be absent more than three times a week (Tr. 368). In support of these opinions Dr. Hatcher noted Plaintiff's complaints of "chronic back pain with muscle spasm," as well as his "history of herniated disc (L4-L5), moderate degenerative disc disease, and some facet joint inflammation at L4-L5" (*id.*). The ALJ acknowledged these opinions but did not accept all of them despite Dr. Hatcher's status as a treating physician (*see* Tr. 23).[14] Plaintiff contends the ALJ erred in this regard.

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d at 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or

---

[14] The ALJ determined that Plaintiff has the following physical RFC: he can occasionally lift and carry up to twenty pounds and frequently lift and carry up to ten pounds; he can stand, walk, and sit up to six hours in an eight-hour workday; and he is occasionally able to stoop, crouch, crawl, kneel, balance, and climb stairs or ladders.

laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527 (d)(2).  Moreover, an ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

In rejecting Dr. Hatcher's opinions the ALJ found that the limitations assessed on the MSS form are inconsistent with Dr. Hatcher's treatment notes and the MRI studies that revealed only "slight abnormalities" (Tr. 23).  Plaintiff contends that neither Dr. Hatcher's notes nor the MRI findings are inconsistent with Dr. Hatcher's opinions and, therefore, the ALJ's findings lack substantial support in the record.

Initially, Plaintiff asserts that Dr. Hatcher's notes are not inconsistent with his opinions on the MSS form because they frequently characterize Plaintiff's pain as "severe" (*see* Doc. 20 at 20).  Dr. Hatcher's characterizations, however, are based on Plaintiff's description of his pain.  For example, on October 11, 2004, notes from PFM explicitly state, "[Plaintiff] states his back pain is severe in nature" (Tr. 267 (emphasis added); *see also, e.g.*, Tr. 239, 274, 358 (same)).  Likewise, on the MSS form Dr. Hatcher specifically noted that his opinions were based—at least in part—on Plaintiff's subjective complaints (*see* Tr. 368).  However, as discussed *infra*, Plaintiff was properly found less than fully credible by the ALJ.  Therefore, the "consistency" identified by Plaintiff is not a meaningful "consistency," because Plaintiff's subjective complaints were not deemed credible.

Likewise, to the extent Dr. Hatcher based his opinions on Plaintiff's complaints of pain, they are not entitled to deference.[15]

In a similar argument, Plaintiff asserts that the PFM treatment notes occasionally document Plaintiff grasping the examining table or otherwise shifting his posture to accommodate his pain, which actions are compatible with the amount of pain Plaintiff reported and with the opinions of Dr. Hatcher (*see* Doc. 20 at 20). It is evident, however, from a review of some of those treatment notes that the sincerity of Plaintiff's actions was questioned by PFM staff (*see, e.g.*, Tr. 364 ("[Plaintiff] is standing when I [PA Baxley] enter the room and grasping the table <u>as if</u> he's in extreme pain" (emphasis added)[16]). It matters not, however, whether PA Baxley or Dr. Hatcher found Plaintiff's actions sincere. Plaintiff's actions—like his verbal complaints of pain—are subjective, and the ALJ was not required to accept as credible his subjective complaints even if his treatment providers did.

Thus, having found Plaintiff's contentions unpersuasive, the court considers whether the ALJ's finding (that is, that the opinions on the MSS form are inconsistent with both Dr. Hatcher's treatment notes and the MRI studies) is otherwise substantially supported by the record.

The treatment notes from PFM reflect numerous notations suggesting that Plaintiff's condition was adequately controlled by medication and, therefore, not as limiting as Dr. Hatcher later opined. For example, in July 2005 Plaintiff was presented with an option of increasing his pain medication to Percocet, but he declined. In December 2005 Plaintiff reported that his back was not bothering him as much as it normally bothered him, suggesting that Plaintiff was responding well to his medication regimen. In February 2006 Plaintiff declined to see a pain management physician. In August 2006 Plaintiff told Dr. Hatcher he did not want to pursue surgery as long as medication was controlling his symptoms, and Plaintiff made similar comments in September and October 2006.

---

[15] As detailed *supra*, Dr. Hatcher's treatment notes contain indications of malingering, such as notations regarding the surveillance tape that depicts Plaintiff performing activities that are in "stark contrast" to the pain he reported (and abilities he displayed) when seeking treatment. The notes also contain indications of drug-seeking or drug-abusing behavior, including the mysterious disappearance of a large amount of methadone from Plaintiff's home. They also contain repeated references to Plaintiff's financial difficulties and resulting need to obtain disability benefits, all of which undermine the credibility of his subjective complaints, and correspondingly, any opinions based on those complaints.

[16] Notably, this notation was made in November 2005, on the same day Plaintiff was warned that his behavior was unacceptable and that his Lortab prescription would <u>not</u> be increased. Thus, Plaintiff had an obvious motive for exaggerating his pain that day (that is, his desire to obtain more Lortab).

By November 2006 Plaintiff reported "doing better than he ever ha[d] in the past," and Dr. Hatcher concluded that Plaintiff was apparently on the "perfect" medication regimen. Lastly, in February 2007 Plaintiff reported that medication alleviated most of his pain (Tr. 326).

Additionally, the treatment notes reflect that in or about May 2006 Dr. Hatcher encouraged Plaintiff to pursue work at a sawmill, which encouragement suggests a belief by Dr. Hatcher that Plaintiff was not debilitated by his pain. It also suggests a belief that Plaintiff was capable of working at a job that likely requires physical capacities well beyond those found on the MSS form (indeed, a vocational expert ("VE") testified that Plaintiff's previous work at a sawmill was performed at the "heavy" level of exertion and that such work is generally performed at a "medium" level of exertion (*see* Tr. 432–33)). Thus, as the ALJ found, Dr. Hatcher's treatment notes do not support the opinions he later offered on the MSS form.

With regard to the MRI studies, as previously discussed, the record contains evidence of five lumbar MRIs, which were obtained in April 2003, January 2004, January 2005, August 2006, and April 2007 (the first three were obtained prior to the date Plaintiff alleges he became disabled, and the fourth and fifth were obtained after Plaintiff's date last insured for DIB purposes).[17] Plaintiff does not contend, and the record does not support a finding, that the April 2003 and January 2004 MRIs support Dr. Hatcher's opinions.[18] Thus, turning to the MRI obtained on January 17, 2005—less than three months before the date Plaintiff alleges he became disabled—the court concludes that it does not support the restrictions imposed by Dr. Hatcher.[19] The radiologist observed, in relevant part, that the January 2005 MRI revealed only "mild" spinal canal stenosis and "mild" proximal foraminal stenosis. Likewise, the August 2006 MRI—that showed a broad-based midline disc protrusion at L4-5, "mild" spinal canal stenosis, "mild to moderate" inferior foraminal stenosis secondary to bulging disc material, and "mild" degenerative changes—does not support the

---

[17] A cervical MRI was obtained in January 2005, but Plaintiff does not contend that it supports Dr. Hatcher's opinions (*see* Doc. 20 at 20); thus, only the lumbar MRIs are discussed.

[18] Indeed, in October 2004, Dr. Park, an orthopedic specialist who had reviewed the January 2004 MRI as well as x-ray studies, opined that Plaintiff had no restrictions in returning to work, suffered no permanent injury as a result of the work-related injury, and had a "permanent impairment rating" of zero (Tr. 193).

[19] Although Plaintiff does not assert that this MRI supports Dr. Hatcher's opinions (*see* Doc. 20 at 20), it is discussed here because its results are relevant—for comparison purposes—to the interpretation of later MRIs.

limitations imposed by Dr. Hatcher. While the August 2006 MRI reflects some abnormalities, they were described as only mild or mild to moderate. Moreover, as the radiologist noted and the ALJ observed, there was no significant change from the January 2005 MRI (*see* Tr. 22, 337). Furthermore, when Plaintiff met with Dr. Hatcher to review the August 2006 MRI he again turned down the possibility of any treatment other than pain medication, suggesting that—despite the mild to moderate abnormalities depicted on the MRI—Plaintiff's pain and condition were adequately controlled by Dr. Hatcher's conservative course of treatment. Lastly, the April 2007 MRI, revealed only "slight" disc degeneration, no definite disc herniation or spinal stenosis, and only a "slight degree of facet joint inflammation." As with the earlier MRI results, these findings do not support the restrictive limitations imposed by Dr. Hatcher on the MSS form, and the ALJ did not err in so concluding.

A final contention by Plaintiff, however, must be addressed. In arguing that the MRI studies support the opinions of Dr. Hatcher, Plaintiff has identified a comment made by Dr. Hatcher after reviewing the August 2006 MRI (*see* Doc. 20 at 20). Specifically, Plaintiff points to Dr. Hatcher's comment that the MRI revealed "some appreciable disease . . . with little change from a previous study" that "certainly could cause [Plaintiff's] symptoms of pain" (Tr. 335). However, Dr. Hatcher admitted that he was not qualified to interpret MRI results or determine the clinical significance thereof. Specifically, Dr. Hatcher stated as follows: "[Plaintiff] does have an abnormal MRI and it is unclear the clinical significance of this. I believe it is clinically significant and I believe he does deserve a neurosurgical evaluation but certainly I do not have the qualifications to say with absolutely [sic] certainty of this." (Tr. 254).[20] Moreover, Dr. Hatcher acknowledged that the August 2006 MRI showed only minimal change from the January 2005 MRI, but as previously noted, the January 2005 MRI revealed only "mild" stenosis. And finally, the court notes that Dr. Hatcher did not definitively state that the abnormality depicted on the MRI would necessarily cause Plaintiff's pain; he opined that it "could" cause such pain.

---

[20] Thus, to the extent Dr. Hatcher relied on MRI studies in forming his opinions on the MSS form, the opinions are not reliable because of Dr. Hatcher's lack of expertise and confidence in interpreting such studies, as the ALJ observed (*see* Tr. 22).

In sum, the ALJ clearly articulated his reasons for rejecting Dr. Hatcher's opinions, and the reasons stated are supported by substantial record evidence. Plaintiff, therefore, is not entitled to reversal on this ground.

B.     Mental RFC Determination

Plaintiff next contends the ALJ failed to incorporate appropriate limitations into the mental RFC determination (Doc. 20 at 16). Specifically, Plaintiff alleges that despite finding his schizophrenic disorder, affective disorder, anxiety disorder, somatoform disorder, and BIF severe, the ALJ considered only Plaintiff's "'IQ and special education,'" in limiting Plaintiff to "'simple, repetitive low demand jobs'" (Doc. 20 at 16 (quoting Tr. 20)).

Plaintiff, however, has quoted from only one portion of the ALJ's opinion. When the opinion is read as a whole—and considered in conjunction with the testimony of the VE—it is evident that the ALJ included additional (and appropriate) limitations into the mental RFC determination. Initially, after finding the aforementioned impairments severe, the ALJ considered whether any met or equaled a listed impairment (Tr. 19–20). In finding that none did, the ALJ specifically determined that the impairments failed to meet the "paragraph D" criteria of Listing 12.05 (Mental Retardation) and the "paragraph B" criteria of Listings 12.03 (Schizophrenia), 12.04 (Affective Disorders), and 12.07 (Somatoform Disorders) (Tr. 20). That is, Plaintiff's mental impairments did not "result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration" (*id.*). Rather, the ALJ determined—consistent with the opinions of Dr. Martin and Dr. LaMarche—that Plaintiff had no more than moderate functional limitations as a result of his severe impairments (*see* Tr. 20, 222, 305). The ALJ then articulated Plaintiff's mental RFC as follows: "His ability for understanding, remembering and carrying out detailed instructions, maintaining attention and concentration, completing a normal workday/week, and setting goals is moderately limited," <u>and</u> he "is limited to unskilled work based on his IQ and special education and retains the capability to do simple, repetitive low demand jobs" (Tr. 22).

Additionally, the ALJ noted that in finding Plaintiff "not disabled" he relied on the testimony of the VE (Tr. 24), who considered Plaintiff's "moderate" mental limitations in reaching his opinions. Indeed, the transcript reflects that the ALJ posed a hypothetical question the VE, in which

the VE was asked to consider (in relevant part) the limitations assessed by Dr. LaMarche on Exhibit B-15F, which limitations are consistent with the limitations incorporated in the RFC determination and which include limitations based on all of Plaintiff's impairments, including not only his BIF, but also his paranoid schizophrenia, depression, and anxiety (*see* Tr. 295–98, 300, 305, 309–10, 434–35). And in response to the hypothetical question, the VE identified several available jobs the hypothetical individual could perform, each of which are "light" and "unskilled" (*see* Tr. 436–37). Thus, the ALJ's hypothetical question, like the mental RFC determination, included limitations in addition to those related to Plaintiff's low intelligence. Moreover, the limitations are substantially supported by the record, and the ALJ did not err in relying on the VE's testimony that even with these limitations "jobs exist in significant numbers in the national economy that" Plaintiff can perform (Tr. 24). Accordingly, Plaintiff is not entitled to relief on this ground.

C. The Opinions of Dr. Horvart and Dr. Decker

Plaintiff next contends the ALJ erred in rejecting the opinions of Dr. Horvart and Dr. Decker, consultative examiners.

The opinions of non-treating psychologists are not ordinarily entitled to substantial weight. *See* McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (citing Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986) (the rule giving great weight to physician's opinion does not apply where physician has only examined patient one time)); Wilson, 734 F.2d at 518. The opinions, however, should nevertheless be evaluated. *See* 20 C.F.R. § 404.1527 (every medical opinion should be evaluated, and unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to be given to any medical opinion: examining versus non-examining; treatment relationship (treating sources are given more weight), including length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship; supportability of the opinion(s); consistency with the record as a whole; specialization; and "other factors"). An ALJ, however, may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)); *see also* Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981) ("The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.").

Here, although the ALJ did not explicitly state that he was discounting the opinions of Dr. Horvat and Dr. Decker, it is evident from the ALJ's discussion of their opinions that they were implicitly rejected by the ALJ, as Plaintiff acknowledges (*see* Doc. 20 at 16; Tr. 22). The question thus becomes whether the ALJ's reasons for rejecting their opinions are substantially supported by the record.

In discounting their opinions, the ALJ first noted that Plaintiff "has not required psychiatric hospitalization nor has he been treated by any mental health professional" (Tr. 22).[21] Indeed, the record clearly establishes that Plaintiff had no psychiatric hospitalizations. And, the only records from mental health professionals (other than those from agency experts and one-time consultative examiners) are those from the LMC, where Plaintiff was referred after committing a domestic violence offense (in 1999) and after his son was removed from his home (in or about March 2004). While the LMC records do not appear to be "treatment records," as they suggest that Plaintiff was required to present there (by both the criminal court system and the DCF), as opposed to voluntarily presenting for treatment, even if the LMC records are considered "treatment records" they precede the alleged onset of Plaintiff's disability (April 4, 2005). Thus, the ALJ correctly noted that Plaintiff was not "treated" by a mental health professional, and to the extent he had any such "treatment," it did not occur during the time frame relevant to this appeal. Accordingly, the first reason articulated by the ALJ is substantially supported by the record.

Next, the ALJ noted that Plaintiff reported auditory and visual hallucinations to Dr. Horvat, but Dr. Hatcher consistently found that Plaintiff exhibited no psychosis (Tr. 22). Indeed, as discussed *supra*, on approximately fifteen different occasions between December 2004 and September 2006, Dr. Hatcher conducted psychological examinations and concluded that Plaintiff's mental status was essentially normal (with the exception of once noting anxiety and on another occasion noting a flat affect). Thus, the longitudinal evidence concerning Plaintiff's mental status is substantially inconsistent with Dr. Horvat's descriptions of Plaintiff's mental status after seeing

---

[21] It should be noted that the ALJ considered (and discounted) the opinions of Dr. Horvat and Dr. Decker in the same paragraph of his opinion, a paragraph the begins with the ALJ's statement that Plaintiff did not require hospitalization or treatment (Tr. 22). Thus, when the paragraph is read in its entirely, it is evident that the ALJ relied upon this first reason (that is, the lack of hospitalization and treatment) in discounting the opinions of <u>both</u> Dr. Horvat and Dr. Decker.

Plaintiff on only one occasion. While seemingly acknowledging the inconsistencies (*see* Doc. 20 at 17), Plaintiff notes that Dr. Horvat is a psychologist while Dr. Hatcher is a family physician (*id.*). Plaintiff is correct, but that alone is not a reason to afford greater weight to Dr. Horvat's opinion, as specialization is but one factor the ALJ should consider. Thus, the inconsistency between the normal findings of Dr. Hatcher (who, directly—or indirectly through his staff—interacted with Plaintiff on at least a monthly basis over the course of many years), and the severely abnormal findings of Dr. Horvat (who interacted with Plaintiff on only one occasion), was a legitimate basis to afford lesser weight to Dr. Horvat's opinions.[22]

Finally, the ALJ noted, correctly, that Dr. Horvat's opinions are somewhat equivocal (Tr. 22). Specifically, the ALJ pointed to Dr. Horvat's comment that some of Plaintiff's mental deficiencies were "difficult to confirm" without additional testing or review of past test records (*see* Tr. 22; *see also* Tr. 213), and there is no evidence in the record demonstrating that Dr. Horvat conducted any additional testing or reviewed any past test results.

Before discussing the opinions of Dr. Decker, the undersigned addressed two contentions made by Plaintiff regarding the opinions of Dr. Horvat. First, Plaintiff argues that the ALJ misconstrued the following statement made by Dr. Horvat: "[Plaintiff ] appears to need a supervised situation and might be able to work in a sheltered workshop, if they are able to handle both physical [sic] and mentally handicapped." (*see* Doc. 20 at 17; Tr. 213). In considering the foregoing statement, the ALJ commented that despite diagnosing Plaintiff with paranoid schizophrenia, Dr. Horvat believed Plaintiff was "capable of working in a supervised situation" (Tr. 22). Thus, the ALJ appears to have concluded that Dr. Horvat's diagnosis was inconsistent with an opinion that Plaintiff was capable of working, even in a supervised or sheltered situation. The ALJ's comment and apparent conclusion do not clearly establish that he actually misconstrued Dr. Horvat's statement or articulated a reason unsupported by the record, but even if he did, the apparent inconsistency between Dr. Horvat's diagnosis and opinion was but one reason the ALJ considered in discounting

---

[22] Moreover, the record establishes that Plaintiff was well aware that Dr. Horvat's evaluation was conducted in connection with his claim for disability benefits, and similarly, that the information obtained by Dr. Horvat would be used in connection with his claim. Plaintiff therefore had a motive to exaggerate his condition. Likewise, as the ALJ and two of the agency consultants intimated, the contrast between Plaintiff's presentations to Dr. Hatcher and his presentation to Dr. Horvat, is indicative of malingering (*see* Tr. 21–22, 224, 307).

Dr. Horvat's opinions. The other factors considered by the ALJ are substantially supported by the record and sufficient—standing alone—to discount the opinions. Thus, any error is harmless.

Second, Plaintiff asserts the ALJ erred in failing to consider his 2004 GAF scores, which scores indicate "serious" symptoms or impairment and support Dr. Horvat's opinions (Doc. 20 at 18 (referencing Tr. 177 (GAF score of 51), Tr. 189 (score of 50); Tr. 191 (score of 56)). Those GAF scores, however, were all assessed prior to April 4, 2005, the date Plaintiff he alleges he became disabled. Moreover, each score is accompanied by a notation indicating that the score reflects Plaintiff's "current" condition or his condition on the day of the assessment (*see* Tr. 177, 189, 191). Thus, the scores do not reflect Plaintiff's condition during the time frame relevant to this appeal. Moreover, only one of the three scores cited by Plaintiff (the score of 50, assessed by a nurse on June 10, 2004), actually indicates "serious" symptoms; the other two scores indicate only moderate symptoms, as do other scores in the record not cited by Plaintiff (*see, e.g.*, Tr. 179 (score of 55), Tr. 188 (score of 60), Tr. 191 (score of 56)). Furthermore, as the Commissioner notes, the GAF scores cited by Plaintiff were assessed during a period which was already adjudicated and during which Plaintiff was found "not disabled" (Doc. 25 at 8 (citing Tr. 17, 406)). Similarly, Plaintiff cites as evidence consistent with Dr. Horvat's opinions the fact that Plaintiff's children were removed from his home. Again, however, this event precedes the date Plaintiff alleges he became disabled. Moreover, the children's removal does not establish that Plaintiff is psychotic or otherwise as limited as Dr. Horvat has opined, especially considering that the children—one of whom has special needs—were evidently returned to Plaintiff in or about March 2005, prior to the date Plaintiff alleges he became disabled, and were living with Plaintiff at the time of his hearing (*see* Tr. 420–22)

With regard to the opinions of Dr. Decker, the ALJ found that Plaintiff's ability to work steadily for many years is inconsistent with Dr. Decker's opinion that Plaintiff would have difficulty functioning independently or maintaining employment (Tr. 22, 67–68). Plaintiff asserts that this finding is not supported by the record, and because it is the only reason cited by the ALJ for discounting Dr. Decker's opinion, Plaintiff is entitled to reversal. Initially, as to whether the reason is supported by the record, Plaintiff asserts that in the "past ten years, [Plaintiff] never earned more than $10,000.00, usually earning $1,000–4,000 a year," which low earnings are consistent with Dr. Decker's opinions because they suggest that Plaintiff was not consistently gainfully employed (*see* Doc. 20 at 18–19). The record establishes, however, that Plaintiff was continuously employed from

1976 through 2002 (*see* Tr. 139), as the ALJ found, which employment demonstrates Plaintiff's ability to work despite his mental impairments. Indeed, Plaintiff's own descriptions of his work history substantiate the ALJ's finding and contradict the opinions offered by Dr. Decker (*see, e.g.,* Tr. 105 (reflecting Plaintiff's report that he worked as a laborer eight hours a day, five days per week, from 1988 through 2002); Tr. 139–40 (work history report, generally reflecting same)). Although Plaintiff's work precedes the date he alleges he became disabled, the work is a relevant consideration because it demonstrates Plaintiff ability to work despite his mental limitations, and there is no credible evidence establishing that Plaintiff's mental condition substantially deteriorated since 2002. *See* Goff v. Barnhart, 421 F.3d 785, 792–93 (8th Cir. 2005) (fact that claimant gainfully worked with her impairment, coupled with the absence of evidence of significant deterioration in her condition, demonstrates that her impairments are not disabling in the present). Furthermore, the ALJ's reason for discounting Dr. Decker's opinion is especially compelling considering Plaintiff's report that he stopped working in 2002 due to back and neck issues; he did not report that any mental difficulties interfered with his ability to work (*see* Tr. 150), and he has not sought treatment by a mental health specialist since 2002.

Lastly, as to whether the ALJ cited only one reason for discounting Dr. Decker's opinions, the undersigned has previously concluded that the ALJ also considered that Plaintiff was never hospitalized or treated by a mental health professional (*see* footnote 21, *supra*). Additionally, the ALJ implicitly discredited Dr. Decker's opinion based on the normal psychological findings of Dr. Hatcher, which he discussed earlier in the same paragraph (*see* Tr. 22). Thus, it is evident that the ALJ considered more than one reason for discounting Dr. Decker's opinion, and all of the reasons considered are substantially supported by the record.

Accordingly, the ALJ did not err in discounting the opinions of Dr. Horvat or Dr. Decker.

D.      Plaintiff's Credibility

Plaintiff asserts that the ALJ erred in discrediting his subjective complaints because the reasons he cited for doing so are not supported by the record (Doc. 20 at 21–23).

As this court is well aware, pain and other subjective complaints are treated by the Regulations as symptoms of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, "unless medical

signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." The Eleventh Circuit has articulated a three-part pain standard, sometimes referred to as the Hand test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Hand v. Heckler, 761 F.2d 1545, 1548 (11th Cir. 1986) (originally adopting the three-part pain standard). The Eleventh Circuit continues to follow the Hand test. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Ogranaja v. Commissioner of Social Security, 186 Fed. Appx. 848, 2006 WL 1526062, at *3 (11th Cir. June 5, 2006) (quoting Wilson); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain [or other symptom]." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[23] "This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." Hand, 761 F.2d at 1548–49. It is within the ALJ's "realm of judging" to determine whether "the quantum of [symptoms a claimant] allege[s] [is] credible when considered in the light of other evidence." Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984). The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination. If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's

---

[23] Decisions of the United States Court of Appeals for the Fifth Circuit decided on or before September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

credibility. *See* Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1004 (11th Cir. 1987)).

In the instant case, the ALJ first noted that the objective medical evidence does not confirm the severity of Plaintiff's alleged pain and other symptoms. As previously discussed, the lumbar MRIs, while revealing some abnormalities, do not substantiate Plaintiff's allegations, such as his testimony that he can walk only fifteen feet. The ALJ may consider objective evidence, or lack thereof, when determining an individual's credibility. *See* 20 C.F.R. § 404.1529(c); *see also* Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991) (while lack of medical evidence to support the degree of pain alleged cannot be the sole determinant of a claimant's believability, it is an important factor that may be considered).

In further discounting Plaintiff's credibility, the ALJ noted that Plaintiff's treating physician did not instruct him to limit his activities of daily living or to refrain from performing work (Tr. 23). This reason is also supported by the record, as Dr. Hatcher's treatment notes lack any work-related or activity-related restrictions (the notes actually contain just the opposite, that is, encouragement that Plaintiff pursue work at a sawmill). Moreover, the ALJ did not err in considering this factor. *See* Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir. 2006) ("There is no indication in the treatment notes that [] any of [the claimaint's] doctors restricted his activities, or advised him to avoid prolonged standing or sitting."); Kelley v. Chater, 62 F.3d 335, 338 (10th Cir. 1995) (in discounting claimant's allegation that he "needed a two-hour nap each day," ALJ considered fact that he never reported this to his physician, and no physician opined that he was disabled); Singleton v. Astrue, 542 F. Supp. 2d 367, 379 (D. Del. 2008) (in evaluating a plaintiff's credibility, ALJ did not err in considering, among other factors, that "none of [p]laintiff's treating physicians identified any specific functional limitations arising from her fibromyalgia or other conditions that would render her totally disabled," and plaintiff received only conservative, routine, care).

Continuing, the ALJ pointed to Plaintiff's conservative treatment, including the lack of hospitalizations, surgeries, or emergency room visits for pain, noting that such conservative treatment is inconsistent with Plaintiff's allegations of disabling limitations (*see* Tr. 23). Likewise, the record establishes that Plaintiff did not undergo additional ESIs and PT as recommended and declined referral to a pain management physician. *See* Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996) (allegations of disabling pain may be discounted because of inconsistencies such as

conservative medical treatment); Singleton, 542 F. Supp. 2d at 379 (same); *see also* Woodum v. Astrue, Case No. 8:07cv404, 2008 WL 759310, at *3 (M.D. Fla. March 20, 2008) (ALJ properly considered that "limited and conservative treatment . . . is inconsistent with the medical response that would be expected if the physician(s) found the symptoms and limitations to be as severe as reported by the claimant"). Moreover, the treatment notes from PFM contain numerous notations suggesting that Plaintiff's condition was adequately controlled by medication, especially when the notations are considered along with Plaintiff's steadfast refusal to consider other forms of treatment. "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (citation omitted). *See also* Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (citations and quotation omitted).

The ALJ also noted that Plaintiff's daily activities, including caring for his daughter and disabled son, driving, shopping, and riding a stationary bike, weighed against the credibility of his subjective complaints (Tr. 23). The ALJ may consider such daily activities when evaluating subjective complaints of disabling pain and other symptoms. *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i). Plaintiff contends, however, that the ALJ erred in considering Plaintiff's "minor personal activities" (Doc. 20 at 22–23 (citing, among other cases, Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("everyday activities of short duration, such as housework or fishing," does not disqualify a plaintiff from disability)). The court cannot agree. Plaintiff testified that he could drive for forty-five minutes and ride a stationary bike for fifteen minutes. These are not necessarily "minor activities," and they—along with Plaintiff's other reported activities—weigh against the credibility of his subjective complaints, as the ALJ found (Tr. 23, 419–23, 425–26, 428). Moreover, although Plaintiff's descriptions of his activities show some limitations, the ALJ was not required to believe all his assertions concerning those activities. *See* Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996). Furthermore, Plaintiff's daily activities were only one of several factors considered by the ALJ in discounting his subjective complaints, and the ALJ did not find that Plaintiff's activities demonstrate that he experiences no pain; the ALJ merely discounted Plaintiff's complaints to the extent he alleged (*see* Tr. 23). Plaintiff also contends the ALJ erred in considering that Plaintiff cared for his children because the children were removed from Plaintiff's home by the DCF (Doc. 20 at 22). However, as noted *supra*, the

children were returned to Plaintiff one month prior to the date he alleges he became disabled, and they resided with him during the time frame relevant to this appeal.[24]

As for Plaintiff's reported mental deficiencies, the ALJ noted that Plaintiff never sought treatment from a mental health professional; rather, he obtained antidepressant medication from Dr. Hatcher, a family physician (Tr. 23). The record supports the ALJ's finding, as the only physician who treated Plaintiff during the relevant time frame was Dr. Hatcher. Plaintiff's failure to seek treatment by a specialist was properly considered by the ALJ. *See* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (failure to seek treatment is a proper factor for the ALJ to consider). Moreover, Dr. Hatcher obviously concluded that Plaintiff's mental condition did not warrant referral to a mental health professional, as no such referral was ever discussed or recommended. These factors support the ALJ's finding that Plaintiff's reports of extreme psychological symptoms, such as the reports made to Dr. Horvat and Dr. Decker, are not credible.

Thus, because the ALJ clearly articulated his reasons for finding Plaintiff less than fully credible, and the reasons cited are substantially supported by the record, Plaintiff is not entitled to relief. *See* Foote, 67 F.3d at 1562 (a clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court); MacGregor, 786 F.2d at 1054 (same).

V.      CONCLUSION

The Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 18th day of June 2010.

---

[24] It should also be noted that Plaintiff's reports regarding his daily activities are internally inconsistent. For example, Plaintiff testified that he could sit for no more than fifteen minutes, but he also testified, inconsistently, that he could drive for forty-five minutes without stopping. Likewise, Plaintiff's ability to ride a stationary bike for fifteen minutes is seemingly inconsistent with other reported limitations, including Plaintiff's report that he could walk no more than fifteen feet or stand longer than fifteen minutes—if Plaintiff can ride a bike for fifteen minutes, he can likely walk far more than fifteen feet or stand longer than fifteen minutes.

*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof. **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.** A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).